IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROSE ROBERTSON,

      Plaintiff,

v.

RIVERSTONE COMMUNITIES,
LLC,

      Defendant.

CIVIL ACTION FILE NO.

1:17-cv-2668-CAP-JKL

## FINAL REPORT AND RECOMMENDATION

Plaintiff Rose Robertson formerly worked as a property manager for Defendant Riverstone Communities LLC, a mobile home community management firm. On June 3, 2015 and July 14, 2015, she was reprimanded for poor performance in her management of two of Defendant's properties in metro Atlanta. Then, from July 16 through July 26, 2015, she took a medical leave of absence. Three days after she returned to work, on July 30, 2015, Defendant fired her, ostensibly due to unsatisfactory performance. Plaintiff asserts that she was actually reprimanded and terminated (as well as subjected to a hostile work environment) on the basis of her race (African-American) in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and 42 U.S.C. § 1981. She also contends that Defendant unlawfully interfered with her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and terminated her in retaliation for exercising her FMLA rights.

The case is before the Court on Defendant Riverstone Communities, LLC's Motion for Summary Judgment. [Doc. 42.] For the following reasons, it is **RECOMMENDED** that the motion be **GRANTED**.

## I.   SUMMARY JUDGMENT STANDARD

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing that it is entitled to summary judgment. *Id.* ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."); *Clark v. Coats & Clark, Inc.*, 929

F.2d 604, 608 (11th Cir. 1991) (holding that *Celotex* did not change the rule that the movant bore the initial burden, and stating, "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial"). The movant may carry its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

"Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608. The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted); *see* Fed. R. Civ. P. 56(c). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In evaluating a summary judgment motion, "[t]he evidence of the non-movant is to

be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor. *Id.* at 255.

## II.   BACKGROUND

### A.   Preliminary Considerations

The Court has considered Defendant's Statement of Undisputed Material Facts ("DSMF" [Doc. 42-1]), Plaintiff's Statement of Additional Facts ("PSAF" [Doc. 44-2]), and the responses thereto ("R-DSMF" [44-1] and "R-PSAF" [Doc. 51-7]), and where possible, the Court has relied on those statements of facts and responses. In large part, however, the statements and responses are unhelpful. In contravention of the local rules, both parties' statements and responses are lengthy, contain immaterial information, and are argumentative. Plaintiff's statement of additional facts is especially difficult to follow due to its length and because it is organized generally by witnesses, rather than chronologically or by subject matter. The Court will not rule on each and every objection or dispute presented by the parties, and will discuss objections and disputes only when necessary to do so regarding a genuine dispute of a material issue of fact. Additionally, the Court includes some facts drawn from its independent review of the record. *See* Fed. R. Civ. P. 56(c)(3).

## B.     Facts

Viewing the evidence in the light most favorable to Plaintiff as the non-moving party, the relevant facts are as follows:

Defendant is a mobile home property management firm.  (Dep. of Hillary Snyder [Doc. 55] at 32.)  In October 2012, Defendant hired Plaintiff as the Property Manager for the Deer Creek Mobile Home Community ("Deer Creek") in Stockbridge, Georgia.  (DSMF ¶ 2.)  Sarah Riutta, who was serving as Defendant's Director of Property Management at that time, hired Plaintiff for the position. (Dep. of Sarah Maureen Riutta [Doc. 49] at 17.)

In January 2014, Plaintiff won the Property Manager of the Year award for 2013.  (DSMF ¶ 13, R-DSMF ¶ 13.)  There is no dispute that she won the award based on objective financial goals, including occupancy rates, accounts receivable rates,[1] and overall profitability.  (DSMF ¶ 13, R-DSMF ¶ 13; *see also* Riutta Dep. at 29-30.)  Despite winning the award on her own merit, a property manager named "Nicole" told Plaintiff at the awards ceremony that she won the award because she is black.  (Dep. of Pl. [Doc. 59] at 114; DSMF ¶ 14.)  Another property manager,

---

[1] "Accounts receivable" or "AR" refers to the amount of uncollected rent (still owed by tenants) for a particular property.  (*See* Dep. of René Scott [Doc. 57] at 139-40.)

René Scott, who was standing next to Nicole, agreed, commenting, "yes, she won it because she was black." (Pl. Dep. at 114; DSMF ¶ 15.) In response, Plaintiff giggled and walked away; however, she thought the comments were disrespectful and offensive. (Pl. Dep. at 115-16.) Plaintiff reported the comments to Shannon Smith, her supervisor at the time. (*Id.*; Dep. of Shannon Smith [Doc. 60] at 13.)

Two months later, in March 2014, Plaintiff assumed property management responsibilities for a second community, Clayton Village Mobile Park Community ("Clayton Village") in Jonesboro, Georgia. (DSMF ¶ 16; Pl. Dep. at 24-25.) At that time, she reported to Senior Regional Manager Melissa Loeffelbein.[2] (DSMF ¶ 16.) Around five months later, in August 2014, Plaintiff was promoted to Area Manager and took on additional duties of overseeing the management operations at five additional communities in Georgia.[3] (Pl. Dep. at 49-50; Snyder Dep. at 37.) Following her promotion, she continued to report to Ms. Loeffelbein. (DSMF ¶ 18.)

---

[2] According to Plaintiff, at that time, Ms. Loeffelbein in turn reported directly to Ms. Smith. (Pl. Dep. at 49.)

[3] Area Managers oversee nine or fewer properties. (Snyder Dep. at 36.) Regional Managers oversee ten properties or more. (*Id.*)

6

Less than a year later, on May 4, 2015, Plaintiff was demoted to Property Manager, apparently due to performance issues.[4]  (Snyder Dep. at 36, 53; Dep. of Melissa Loeffelbein [Doc. 58] at 45.)  Within a week of her demotion, Plaintiff began to report to Ms. Scott, one of the individuals who had commented that Plaintiff won the 2013 property manager of the year award due to her race.  (DSMF ¶ 24; PSAF ¶ 13.)  On May 10, 2015, Plaintiff received an email from Ms. Scott bearing the subject line "Expectations."  (Pl. Dep. at 75-76, Ex. 8.)  The email read as follows:

> Rose,
>
> We have to get this property headed in the right direction immediately.  Properties that do not show improvement over the span of 3 months (AR or occupancy) are subject to disciplinary action.
>
> Deer Creek
>
> • Occupancy was at 499 in Feb and has been 497 since March
>
> • AR continues to trend around $14,000 for the last two month[s] (this must improve this month)

_____

[4] Plaintiff does not challenge the legality of her demotion.  Indeed, she was happy to return to the Property Manager position, as she understood that it was an alternative to her being terminated from employment.  (PSAF ¶ 12; Pl. Dep. at 70-71.)

> We need to get the occupancy back up immediately. The AR needs to show improvement each month. It cannot just continue to stay stagnant.
>
> Please let me know if you have questions.

(Pl. Dep. Ex. 8.) Plaintiff understood from this email that Ms. Scott was not happy with the state of occupancy or accounts receivable at Deer Creek. (DSMF ¶ 30.)

Problems at the property persisted, however. Over the following month, the occupancy and AR numbers for Deer Creek failed to improve. (DSMF ¶ 31; Pl. Dep. at 79.) In addition, two pools at Deer Creek that Plaintiff was supposed to have opened by Memorial Day remained closed as of June 3, 2015, despite her efforts to open the pools on time.[5] (DSMF ¶ 32; R-DSMF ¶ 32.) On June 3, 2015, Plaintiff was reprimanded for performance issues. (Pl. Dep. at 79-80, Ex. 9.) Her performance deficiencies were detailed in a "Team Member Counseling Summary" which Plaintiff reviewed in a meeting with Ms. Loeffelbein and Ms. Scott. (*Id.*) As Plaintiff's supervisor, Ms. Scott had input into the contents of the warning. (Scott Dep. at 109; *see also* Leoffelbein Dep. at 50-51.) The warning noted

---

[5] Plaintiff contends that the pools were not opened before Memorial Day despite her diligent efforts, as she had a difficult time finding a vendor who could service the pools—she testified contact three or four different vendors. (Pl. Dep. at 82-83.) There is no dispute, however, that Plaintiff was aware of her responsibility to open the pools and that they were not opened before Memorial Day. (*Id.* at 82.)

decreasing occupancy numbers at the Deer Creek and Clayton Village properties

and increasing AR at Clayton Village.  (Pl. Dep. Ex. 9.)  It stated:

> The occupancy at Deer Creek has stayed stagnant at 497 for the
> months of March, April and May.  This is a drop from 499 in
> February.  The AR continues to climb each month from
> $14,812(March) to $23,215(May).  The occupancy at Clayton
> Village was at 102 in both March and April and dropped to 100 in
> May.  April's AR was at 9.3%.

(*Id.*)  The warning also addressed Plaintiff's deficiency in opening the pools at Deer

Creek:

> [Plaintiff] was instructed by the Director of Operations and Senior
> Regional Manager multiple times that the pools for the property
> were to be opened no later than Memorial Day.  As of 6/2/15 neither
> pool is open.  As of 5/29/2015 [Plaintiff] was still in the process of
> finding a vendor that could service them.  It appears there is no sense
> of urgency regarding this issue and her Regional Manager had to
> step in and actually schedule the upcoming appointment.

(*Id.*)  Plaintiff was also counseled for not having housing units connected to

electrical, water or sewer services:

> The RV's that landed at Clayton Village were continually reported
> as ready homes week after week.  Upon walking the units on my site
> visit I [presumably, Ms. Scott] found that the electric/water/sewer
> were not connected.  One unit was being used for storage.  These
> units have been at the property since March.

(*Id.*)  She was finally reprimanded for not covering up a sign at "Clayton Retail"[6]

or attending to items on a fire inspection, despite having been repeatedly asked to

do so by her superiors:

> The President, Director of Operations and Senior Regional Manager
> asked [Plaintiff] to get a sign to cover up the daycare sign at Clayton
> Retail during a site visit on April 23rd.  This was again requested by
> her Regional at the end of April.  During an on site visit the week of
> May 11th there was still no progress with this task.  It ultimately had
> to be taken care of by [Plaintiff's] Regional Manager.  Additionally
> the items on the fire inspection (dated 3/25/15) have not been
> corrected.  The items needing correction were discussed multiple
> times between [Plaintiff] and the Senior Regional Manager,
> however no progress has been made and this is resulting in the
> property not being able to be rented.  Again, there appears to be no
> sense of urgency on [Plaintiff's] behalf.

(*Id.*)

Plaintiff was given the following performance expectations:  (1) the pools

were to be opened immediately and remain open; (2) AR needed to be lowered to

under 3% by July 31, 2015, with improvement in June; (3) month-over-month

occupancy needed to grow immediately; (4) three RV units needed to be ready for

lease by June 12, 2015; (5) the Clayton Retail signage and fire inspection items

---

[6] Clayton Retail appears to be a commercial area of the Clayton Village
property that was also within Plaintiff's area of responsibility; at that time, it was
unleased, and Defendant wanted sign a new tenant to the premises.  (*See* Scott Dep.
at 81-82.)

needed to be corrected by June 12, 2015; and (6) homes addressed in the warning—
reported as ready, but without utilities connects—needed to be immediately readied
and reported to management.  (DSMF ¶ 39; *see also* Pl. Dep. Ex. 9.)

The following day, June 4, 2015, Plaintiff sent an email to Ms. Scott, Ms.
Loeffelbein, and Defendant's human resources director Hilary Snyder stating that
although she disagreed with the write-up and thought that the criticisms of her
performance were unwarranted, "I understand the concerns and with positive
support from Riverstone all concerns that are had, will be taken care of effectively
and immediately."[7]  (Pl. Dep. Ex. 10.)

On June 29, 2015, Plaintiff received a performance evaluation for the first
half of 2015—covering the period from January 1 to June 1, 2015.[8]  (Pl. Dep. at

---

[7] Plaintiff also testified that at no point during her meeting with Ms. Scott
and Ms. Loeffelbein about the write-up did she (Plaintiff) express that the criticisms
were discriminatory in nature.  (Pl. Dep. at 106.)

[8] Plaintiff argues that the mid-year performance review is immaterial
because "the majority of the time period it included (January 1, 2015 until May 4,
2015) concerned a time period during which [Plaintiff] was area manager and Ms.
Loeffelbein completed the form with regard to that position, not the property
manager position in which she was performing at the time of termination."  (R-
DSMF ¶ 43.)  The Court disagrees.  During the time that Plaintiff held the Area
Manager title, she remained responsible for the property manager duties at Deer
Creek and Clayton Village.  (Pl. Dep. at 50.)  In addition, the evaluation discusses
Plaintiff's management of those properties.  Since Ms. Loeffelbein evaluated
Plaintiff on the same responsibilities that she had at the time of her termination

150-151, Ex. 16.). Plaintiff's former supervisor, Ms. Loeffelbein, completed the evaluation. (Loeffelbein Dep. at 54.)  Ms. Loeffelbein noted, among other things, that Plaintiff did not meet expectations with respect to the number of units rented at Deer Creek and Clayton Village.  More specifically, Ms. Loeffelbein wrote that although Deer Creek had been ahead of budgeted occupancy for 2015, occupancy had declined from 499 units in February to 497 in March, and had remained at the same level in April and May.  (Pl. Dep. Ex. 16 at 1.)  Likewise, Clayton Village occupancy levels fell from 102 in January to 100 in May and remained under budget for the months of February, March, April, and May.  Ms. Loeffelbein also indicated that the AR rate for Clayton Village during the six-month review period was 5.86%, and the average for Deer Creek was 8.8%.  According to her evaluation, those rates exceeded Defendant's target rates for the properties, and Ms. Loeffelbein noted that "AR needs to decrease immediately."  (*Id.*)

On July 14, 2015, Ms. Scott issued Plaintiff a second written warning for poor job performance. (DSMF ¶ 46; Pl. Dep. Ex. 17; Scott Dep. at 115.)  Ms. Scott

---

from employment on July 30, 2015, her assessment is not immaterial.  Plus, the Court notes that Plaintiff herself relies on Ms. Loeffelbein's evaluation as evidence of discrimination, which further undermines her assertion that Ms. Loeffelbein's evaluation is immaterial.  [*See* Doc. 44 at 8-9.]

12

drafted the warning and obtained Ms. Loeffelbein's approval before presenting it to Plaintiff.  (Scott Dep. at 115.)  The warning stated that one of the two pools at Deer Creek had failed inspection on July 1, 2015, and remained closed.  (Pl. Dep. Ex. 17.)  According to the warning, the pool failed inspection "due to some very basic items that should have been addressed prior to the inspection taking place" including, missing pool rules, the pool phone not working, and a broken gate latch. (*Id.*)  Maintenance staff members were responsible for those items; however, it was ultimately Plaintiff's responsibility as Property Manager to supervise the maintenance staff to ensure that they tended to those items.  (*Id.* at 161-62; *see also id.* at Ex. 17 ("The [] items were within control of [Plaintiff]'s team and [Plaintiff] should have ensured were completed . . . .").)  Plaintiff does not dispute the content of the warning.  (*Id.* at 157.)

Two days later, on Thursday, July 16, 2015, Plaintiff left work due to a migraine and visited her doctor, Dr. Rhonda Ross.  (Pl. Dep. at 191-92.)  Dr. Ross prepared a generic return-to-work statement indicating that Plaintiff's return-to-work date was unknown, pending a follow-up appointment on Wednesday, July 22, 2015.  (*Id.* at 193, Ex. 20.)  On the evening of July 16, Plaintiff emailed the return-to-work statement to Ms. Snyder and Ms. Scott.  (*Id.* Ex. 20.)  The following day,

Ms. Snyder responded that she would be calling Plaintiff on Monday, July 22, to get more information about Plaintiff's health.  (*Id.* Ex. 21.)

On July 22, Plaintiff returned to Dr. Ross, who recommended that Plaintiff remain out of work until the next Monday, July 27, 2015.  (Pl. Dep. at 200, Ex. 22.) Later that day, Plaintiff spoke to Ms. Snyder, who requested that Plaintiff complete a request-for-leave form and that her doctor complete a certification form [9] regarding Plaintiff's health condition.  (*Id*. at 203-04, 207-09.)  Plaintiff contends that Ms. Snyder told her to return the paperwork by July 31, 2015.[10]  (*Id*. at 204, 213, 217-18.)  During that call, Plaintiff also told Ms. Snyder that she did not want to take FMLA leave, and instead wanted to use accrued paid time off for her absences.  (*Id*. at 209.)  On July 27, 2015, Plaintiff returned to work.  (*Id*. at 201.)

---

[9] These were Defendant's forms, which were available on Defendant's intranet.  (Pl. Dep. at 208.)

[10] Plaintiff's testimony concerning her understanding as to when the paperwork relating to her leave was due is inconsistent.  Plaintiff testified that Ms. Snyder verbally instructed her to return the paperwork by July 31, 2015, (*see* Pl. Dep. at 217-18); however, Plaintiff also testified that she understood she had 15 days after Ms. Snyder provided her with the forms on July 23 (*i.e.*, August 7, 2015), to return the paperwork (*see id*. at 47-48).  This discrepancy is not material, however, as there is no dispute that Plaintiff did not provide a completed certification before her termination from employment on July 30, 2015, before either July 31 or August 7 had passed.

She did not, however, turn in the requested forms to Defendant by July 31.  (*Id*. at 47.)

On the afternoon of July, 28, 2015, Ms. Snyder and Ms. Loeffelbein traveled to Georgia, and, the following day, they and Ms. Scott conducted a site visit of Deer Creek.  (Snyder Dep. at 58, 82-84.)  Discovering that Plaintiff was not present at the property, Ms. Scott, Ms. Snyder, and Ms. Loeffelbein called Plaintiff from their car and asked where she was.  (*Id*. at 58-59; Scott Dep. 121-22; Loeffelbein Dep. at 58-59.)  Ms. Scott placed the call and spoke.  (Loeffelbein Dep. at 59.)  Plaintiff stated that she was at a church function and offered to return to the property; however, Ms. Scott told Plaintiff that would not be necessary.  (Scott Dep. at 122; Pl. Dep. at 243.)  According to Ms. Scott, at the time, the decision had not yet been made to terminate Plaintiff's employment.  (Scott Dep. at 122-23.)

Later in the day on July 29, 2015, Ms. Scott, Ms. Loeffelbein, Ms. Snyder, and Ms. Riutta[11] held a group discussion about Plaintiff's job performance and termination.  (Snyder Dep. at 59-60, 73; *see also* Loeffelbein Dep. at 55-56.)  That evening, Ms. Snyder circulated to Ms. Loeffelbein, Ms. Scott, and Ms. Riutta a

---

[11] As noted above, Ms. Riutta was the Director of Property Management and hired Plaintiff.

draft "Team Member Termination Form" for Plaintiff's discharge the following

day.  (Scott Dep. Ex. 19.)  In the transmittal email, Ms. Snyder wrote:

> Team,
>
> This is what I put together for [Plaintiff's] term form.  Rene [Scott] - I need your help in filling in the blanks please with some of the occupancy data.  Please correct any statement that may be incorrect as well, although I think I have this correct for the most part.
>
> I welcome your feedback here.

(*Id.*)  Ms. Scott participated in the completion of the termination form, including

adding occupancy details for Deer Creek and Clayton Village.  (*Id.* at 124, Ex. 19.)

On the morning of July 30, 2015, Ms. Scott, Ms. Snyder, and Ms.

Loeffelbein met with Plaintiff.  (Scott Dep. at 124-25; Pl. Dep. at 168-69.)  Ms.

Scott attended the meeting in person and presented Plaintiff with the completed

termination form; Ms. Snyder and Ms. Loeffelbein attended via video conference.

(DSMF ¶ 78; Scott Dep. at 124-25; Loeffelbein Dep. at 66; Pl. Dep. at 168.)  Ms.

Loeffelbein told Plaintiff that her employment was being terminated immediately

for performance reasons.  (DSMF ¶ 79; Pl. Dep. at 169-70.)  The written

termination notice that Plaintiff received stated as follows:

> Over the past several months, occupancy and outstanding AR have been moving in the wrong direction at Deer Creek to where it has become one of our most challenged properties.  June occupancy closed at 487 compared to 497 in May, a decrease of 10 units.  July

16

will end without any improvement – but rather further decline. The budgeted occupancy for the close of July is 499. Clayton occupancy [] went from 102 in April to 99 in July. The budgeted occupancy for this property is 107.

Outstanding AR is still not where it should be at Deer Creek – trending to close [to] approximately 5% for the month of July, when the goal is 3%.

The overall appearance of Deer Creek is lackluster at best. One of the pools at the property is still not ready to undergo inspection so that it can be opened – we are more than halfway through the summer – all pools at the property should have been opened in May. Residents['] complaints have been on the rise. We are not seeing the improvement needed at this property – we cannot let it continue to decline. It does not appear that [Plaintiff] is committed to turning this property around, therefore, we have no choice but to terminate her employment effective immediately.

(Pl. Dep. Ex. 19.)

Following Plaintiff's termination, her position was filled immediately by her assistant manager, Keisha Smith, who is African-American. (DSMF ¶¶ 82-83.) On August 3, Ms. Scott hired Kenya Smoot, who is also African-American, to replace Plaintiff. (DSMF ¶¶ 84-85.) Unbeknownst to Plaintiff, Defendant had started the process of looking for someone to replace Plaintiff approximately a week before she was terminated. (Scott Dep. at 64.) At that time, Ms. Loeffelbein and Ms. Scott had decided to conduct a job fair in Stockbridge, Georgia, to hire for a variety of open positions. (*Id.* at 64-66.) Ms. Snyder, Ms. Loeffelbein, and Ms.

Scott interviewed Ms. Smoot at the job fair, and Ms. Scott selected Ms. Smoot to replace Plaintiff.  (*Id.*; Riutta Dep. at 65, 67.)

At some point after Plaintiff's employment ended, Plaintiff spoke with Ms. Smith, her former supervisor who had left Defendant's employment in March 2014. (Smith Dep. at 35-36, 59.)  Ms. Smith told Plaintiff that when she was still working for Defendant, she (Ms. Smith) asked Ms. Scott to come to the Atlanta area to help with a struggling property.  (*Id.* at 19-20.)  Ms. Scott allegedly responded that she did not want to because "There's too many f****ing n*****s in Atlanta, I'm not going there."[12]  (*Id.* at 20.)  According to Ms. Smith, on multiple occasions, Ms. Scott told her that she "hated n*****s," and Ms. Smith had overheard Ms. Scott use the n-word "20 plus" times.  (*Id.* at 20-21, 47.)  All of the incidents in which Ms. Scott allegedly used the n-word occurred prior to March 30, 2014, Ms. Smith's last day of employment.[13]  (*See id.* at 49 (testifying that she did not speak to Ms.

_____

[12] The Court uses "f***ing," "n*****," and "n-word" as less offensive shorthand for the terms actually used, and assumes the reader is familiar with the meaning of these abbreviations.

[13] Plaintiff testified that she could not recall when Ms. Smith told her about Ms. Scott's alleged statements.  (Pl. Dep. at 270.)  Plaintiff speculated, however, that Ms. Smith most likely told her about the statements in 2013, and perhaps 2014. (*Id.* at 271.)

Scott after she was terminated from employment).)   There is no dispute that

Plaintiff never heard Ms. Scott use the word n*****.[14]   (Pl. Dep. at 120, 122.)

### C.   Procedural History

On July 14, 2017, Plaintiff filed this action, and on November 27, 2017,

amended her complaint.  [Docs. 1, 6.]  In her amended complaint, Plaintiff alleges

that Defendant violated Title VII and Section 1981 by discriminating against her

on the basis of race when it subjected her to a hostile work environment and

terminated her employment.  (Am. Compl. [Doc. 6] ¶¶ 40-44.)  She also alleges

that Defendant unlawfully interfered with her rights under the FMLA and retaliated

---

[14] The Court pauses to note that Plaintiff has given shifting accounts of Ms. Scott's purported use of the n-word.  In Plaintiff's EEOC charge, she represented that "Ms. Scott stated she did not like black people, specifically saying that she 'hated n*****s' and that she had previously refused to manage an Atlanta property because she was 'not going to be around all those n*****s.'"  (Pl. Dep. at 120; *see also id.* Ex. 28 (EEOC charge).)  But at her deposition, in response to the question "Has anyone ever told you that they heard [Ms. Scott] use the word 'n*****'?", she responded no.  (*Id.*)  Then, when defense counsel confronted Plaintiff with the inconsistency between the EEOC charge and her testimony, Plaintiff pivoted, testifying that Ms. Smith told her that Ms. Scott "stated she hated n*****s."  (Pl. Dep. at 123.)  Although it beggars belief that Plaintiff would misremember whether someone used such offensive language, especially since Plaintiff represented to the EEOC and wrote in her complaint that Ms. Scott used such language, it is not for the Court to make credibility determinations at this stage.  The Court must therefore assume for purposes of this motion that Ms. Scott used the n-word, repeatedly, to refer to African-Americans and that she expressed a general hostility towards African-Americans.

against her in violation of the FMLA by terminating her employment soon after taking leave from work due to her migraines.  (*Id.* ¶¶ 45-55.)

After the close of discovery, Defendant moved for summary judgment on each of Plaintiff's claims.  [Doc. 42.]  Plaintiff has filed a response [Doc. 44], and Defendant has filed a reply [Doc. 51].  The motion is now ripe for consideration.

## III.   ANALYSIS

The Court organizes its analysis of Defendant's motion as follows.  First, the Court addresses Plaintiff's disparate treatment claims arising under Title VII and Section 1981.  Next, the Court addresses Plaintiff's hostile work environment claims arising under Title VII and § 1981.  The Court then considers Plaintiff's FMLA claims.

### A.   Plaintiff's Disparate Treatment Claims

Title VII prohibits discrimination in employment based on race, among other protected characteristics.  42 U.S.C. § 2000e-2(a).  Section 1981 provides, in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full extent and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. . . .  [T]he term "make and enforce

20

contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(a)-(b) *see also Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) ("Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts.") (citations omitted).   In the context of employment discrimination claims, § 1981 is a remedy parallel to Title VII, and the elements of a disparate treatment claim under § 1981 mirror those of a Title VII claim.   *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995) (explaining that claims under Section 1981 utilize identical methods of proof as Title VII claims and are governed by the *McDonnell Douglas* framework).   Accordingly, the Court addresses Plaintiff's Title VII and Section 1981 claims together.

Defendant argues that Plaintiff's disparate treatment discrimination claims fail as a matter of law because Plaintiff has no direct evidence of discrimination and cannot establish either a prima facie case of race discrimination or that Defendant's articulated reasons for writing her up and terminating her were pretext for discrimination.   [Doc. 42-8 at 10-15.]  Plaintiff responds that she has, to the contrary, presented direct evidence of discrimination, namely, the offensive

21

statements that Ms. Scott made about African-Americans.  [Doc. 44 at 3-5.]  She further argues that she has presented a convincing mosaic of circumstantial evidence sufficient to permit a reasonable factfinder to conclude that she was disciplined and terminated because of her race.  [*Id*. at 6-12.]  On reply, Defendant asserts that Ms. Scott's statements are not direct evidence of discrimination because they predate Plaintiff's write-ups and termination by over a year, and, thus, do not directly relate to those employment actions.  [Doc. 51 at 2-4.]  Defendant additionally argues that Plaintiff cannot establish a prima facie case of race discrimination under the *McDonnell Douglas* framework, as Plaintiff has presented no evidence that Defendant treated any similarly-situated, non-African-American employees more favorably than her.  [*Id.* at 4.]  Defendant finally argues that Plaintiff has not demonstrated a convincing mosaic of evidence that Defendant's actions were motivated by discriminatory animus.  [*Id.* at 4-5]

### 1.   Ms. Scott's Purported Statements Are Not Direct Evidence of Discriminatory Intent

Direct evidence is evidence that establishes the existence of discriminatory intent behind the relevant employment decision without any inference or presumption.  *Standard*, 161 F.3d at 1330.  Direct evidence of discrimination must evince both a discriminatory attitude and a correlation between that attitude and the

discrimination complained of by the employee.   Here, an example of "direct evidence would be a management memorandum saying, 'Fire [Plaintiff]—[s]he is [African-American].'"  *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990).   Importantly, remarks unrelated to the decision-making process itself are not direct evidence of discrimination.  *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Bass v. Bd. of Cty. Comm'rs, Orange Cty.*, 256 F.3d 1095, 1105 (11th Cir. 2001).

Plaintiff argues that the following statements that Ms. Scott made constitute direct evidence of discrimination:  (1) her statement to Ms. Smith that she did not want to work in Atlanta because "there's too many f***ing n*****s in Atlanta"; (2) her statements to Ms. Smith on "multiple occasions" that she "hated n*****s"; and (3) her statement to Plaintiff that Plaintiff only won the property manager of the year award because she was black.  [Doc. 44 at 3-4.]  For as invidious as they are, those statements do not constitute direct evidence of discrimination in this case because they are remote in time from and not directed at the employment decisions that Plaintiff challenges.  Indeed, as noted above, Ms. Smith testified that she last spoke to Ms. Scott in March 2014, just before Ms. Smith left Defendant's employment.  (Smith Dep. at 35, 49.)   Thus, Ms. Scott must have made the

comments well over a year before the alleged adverse actions in this case.[15]
Similarly, Ms. Scott allegedly commented that Plaintiff won the property manager
of the year award because she is black in January 2014, nearly a year-and-a-half
before the reprimands and termination that Plaintiff asserts were discriminatory.
(Pl. Dep. at 112-14.)   To accept Plaintiff's view that Ms. Scott's purported
statements are evidence that Defendant disciplined and terminated Plaintiff because
of her race, one must make inferential leaps—namely, that the racist attitude
continued, and that it directly contributed to the decisions to reprimand and
discharge Plaintiff, despite the involvement of several other individuals without
evidence of such racist animus.   Accordingly, that evidence is better understood as
circumstantial.   *Allen v. City of Athens*, 937 F. Supp. 1531, 1543 (N.D. Ala. 1996)
("Comments by a supervisor that are temporally remote from the challenged
decision can hardly be direct evidence of discrimination, since they require an
inference of a general discriminatory attitude, followed by another inference that
the attitude entered into the making of the challenged decision.").

---

[15] Plaintiff testified that Ms. Smith most likely told her about the statements in 2013, which is even further removed from the employment decisions at issue in this case.  (Pl. Dep. at 271.)

Citing *Wright v. Southland Corporation*, 187 F.3d 1287 (11th Cir. 1999),
Plaintiff contends that "direct evidence" means "evidence from which a reasonable
trier of fact could find, more probably than not, a causal link between an adverse
employment action and a protected personal characteristic"—a broader standard
than the standard discussed above.  [*See* Doc. 44 at 5.]  *Wright* is not precedential
authority, however, as the two other members of the panel in that case concurred
in judgment only and did join the lead opinion.  *See Wright*, 187 F.3d at 1306.  As
noted by a later panel, albeit in an unpublished decision, the case law in this Circuit,
"both before and since *Wright*, has defined "direct evidence" as "evidence, which
if believed, proves existence of fact in issue without inference or presumption."
*Kilpatrick v. Tyson Foods, Inc.*, 268 F. App'x 860, 862 (11th Cir. 2008); *see also
East v. Clayton Cty., GA*, 436 F. App'x 904, 910 (11th Cir. 2011) (observing that
although *Wright* has not been overruled, no published circuit opinion has applied
the standard in *Wright* since it was decided); *Hunt v. Bibb Cty. Props., LLC*, No.
CIV.A. 13-00241-KD-M, 2014 WL 2093796, at *5 n.4 (S.D. Ala. May 20, 2014)
(declining to apply *Wright*'s broader definition of direct evidence), *aff'd sub nom.
Brown v. Bibb Cty. Props, LLC*, 602 F. App'x 755 (11th Cir. 2015).  The Court
agrees with those cases, and finds that the definition of "direct evidence" in *Wright*

is not the applicable standard.  But, even if the "more probably than not" standard enunciated in *Wright* did apply here, Ms. Scott's statements do not meet it, since they are so remote in time and divorced from the events involving Plaintiff's employment that they do not show more probably than not that there is a causal link between Plaintiff's race and her write-ups and termination more than a year later.[16]

In sum, there is no direct link between the Ms. Scott's purported statements and the employment decisions at issue in this case, and therefore no direct evidence of discrimination.  Even so, the alleged statements may nevertheless constitute

---

[16] Plaintiff's further reliance on *Buckley v. Hospital Corporation of America*, 758 F.2d 1525 (11th Cir. 1985), an age discrimination case, for the proposition that remote-in-time comments constitute direct evidence of discrimination is misplaced. Although some of the evidence of discriminatory intent in *Buckley* included a supervisor's ageist comments that predated the plaintiff's termination by over a year, there was also evidence that just a week before plaintiff's termination, her supervisor told her that she "was under stress, and *due to her advanced age*, she had lost her temper'" at the workplace, that "he could not have a supervisor who lost her temper," and told her to take a week off.  *Buckley*, 758 F.2d at 1528.  Here, by contrast, none of the racially charged comments that Ms. Scott purportedly made were close in time to the employment decisions at issue in this case, nor is there evidence that Ms. Scott made any such statement to Plaintiff.  In addition, the supervisor's earlier statements in *Buckley* are better understood as circumstantial evidence of discrimination, as those statements do not "prove the existence of a fact in issue without inference or presumption."  *See Wright*, 187 F.3d at 1298 (explaining that the statements in *Buckley* do not meet the traditional definition of direct evidence).

circumstantial evidence of race discrimination.  The Court therefore will consider

those statements in evaluating Plaintiff's arguments that she can show pretext or

offer a convincing mosaic of discriminatory intent.

> **2.      Under the *McDonnell Douglas* Framework or the Convincing Mosaic Theory, Plaintiff's Disparate Treatment Claims Fail.**

In *McDonnell Douglas*, the Supreme Court set up a three-step framework for

proving employment discrimination claims using circumstantial evidence.  The

plaintiff first has to present a prima facie case of discrimination by showing that

she was a member of a protected group, she was qualified to do the job, that she

was subject to an adverse employment action, and that that the defendant treated

similarly situated employees outside her protected class more favorably or that she

was replaced by a person from outside her protected class.  *Wilson v. B/E*

*Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *Maynard v. Bd. of Regents*

*of Div. of Univ. of Fla. Dep't of Educ. Ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289

(11th Cir. 2003).  The prima facie case creates a presumption that the plaintiff was

subjected to discrimination.  *Wilson*, 376 F.3d at 1087.  The burden of production

then shifts to the defendant to articulate a legitimate, non-discriminatory reason for

the challenged employment action.  *Id*.  If the defendant is able to offer such a

reason, the presumption of discrimination is rebutted, and the burden shifts back to

the plaintiff to show that the defendant's justification is just a pretext for discrimination.  *Id.*

Here, Plaintiff cannot establish a prima facie case of discrimination on the basis of her race because she has failed to present evidence that a similarly-situated, non-African-American employee was treated more favorably.  It is also undisputed that the two individuals who replaced Plaintiff (on an interim and then more permanent basis) were also African-American.  Plaintiff nevertheless argues that certain that Caucasian employees—including Ms. Smith, Ms. Loeffelbein, Ms. Scott, and Keri Claudio (who succeeded Ms. Scott as Regional Manager for Georgia)—were treated more favorably because Defendant did not fire them despite the lackluster performance of its Georgia properties.  [Doc. 44 at 9.]  To the extent that Plaintiff attempts to hold those employees out as comparators, however, the argument fails, as Plaintiff has not shown that those individuals were "similarly situated in all material respects" to Plaintiff.  *See Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1226 (11th Cir. 2019) (holding that it is the plaintiff's burden to demonstrate that comparators are similarly situated as part of her prima facie case). There is no evidence that any of those employees was a Property Manager for Deer Creek, Clayton Village, or similar properties.  Nor has Plaintiff shown how those

employees' job performance compared to Plaintiff's; whether those employees were subject to the same policies, guidelines, or rules; who supervised those employees during the pertinent periods; or how their disciplinary history compared with Plaintiff's.  *See id.* at 1227 (identifying examples of similarities that "will, in the main, underlie a valid comparison").  Accordingly, the Court rejects Plaintiff's unsupported contention that those employees are proper comparators.

Plaintiff argues alternatively that even in the absence of comparator evidence, she can overcome summary judgment by showing a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.  [Doc. 44 at 6-12.]  In certain cases where there is an absence of comparator evidence, a "convincing mosaic of circumstantial evidence" may be sufficient to allow a jury to infer that retaliatory intent motivated an employment decision.  *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328-29 (11th Cir. 2011).  In *Smith v. Lockheed-Martin Corp.*, the Eleventh Circuit stated that "the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment case," and that a plaintiff can survive summary judgment if she "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory

29

intent." *Id.* at 1328.  Typically, it is utilized in circumstances when a plaintiff lacks comparator evidence because there are no other similarly situated individuals, allowing the plaintiff to bypass the presentation of a prima facie case.  Since *Lockheed-Martin*, the Eleventh Circuit has recognized three categories of circumstantial evidence that may be relevant under the convincing mosaic approach:  "(1) suspicious timing, ambiguous statements, similar behavior directed at other members of the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) systematically better treatment of those outside the protected class; and (3) pretext in the employer's justification." *Smith v. City of New Smyrna Beach*, 588 F. App'x 965, 976 (11th Cir. 2014) (citing *Lockheed-Martin*, 644 F.3d at 1328).  This convincing mosaic of circumstantial evidence can substitute for either a prima facie case of discrimination or a demonstration of pretext. *King v. Ferguson Enters., Inc.*, 971 F. Supp. 2d 1200, 1217-18 (N.D. Ga. 2013), *aff'd*, 568 F. App'x 686 (11th Cir. 2014).

Plaintiff relies on the following evidence in an attempt to construct a convincing mosaic that she was discriminated against on the basis of her race:

(1) Ms. Scott's derogatory remarks about African-Americans in general, as well as Ms. Scott's comment that Plaintiff won the property manager of the year award because she is African-American [Doc. 44 at 7];

(2) Plaintiff's contention that, as a strong performer, she would have corrected all the issues referenced in her write-ups had she not been out of leave and fired [*id.* at 7-10];

(3) that the properties that she was managing were unprofitable no matter who was managing them, that Defendant ultimately sold them in 2017, and that Plaintiff did not fire Ms. Smith, Ms. Scott, Ms. Loeffelbein, or Ms. Claudio due to the unsatisfactory performance of the properties [*id.* at 9];

(4) the fact that Ms. Scott was one of the decisionmakers with respect to Plaintiff's discharge, or at least had influence over the decisionmakers, so that her racial bias infected the write-ups and the termination [*id.* at 11-12];

(5) an incident where she wished to write-up two maintenance employees but "Defendant only approved the write-up for the black employee, indicating that the white employee was a 'good guy,'" [*id.* at 9]; and

31

(6) that Defendant had no choice but to hire an African-American to replace her because the applicant pool was predominately African-American [*id.* at 11].

Viewing the evidence in the light most favorable to Plaintiff, the Court cannot find that she has presented evidence of a convincing mosaic that Defendant discriminated against her on the basis of her race. The center tile of the mosaic is Ms. Scott's derogatory statements about African-Americans and her comment in January 2014 that Plaintiff won the property manager of the year award because of her race. The problem for Plaintiff, however, is that in order to construct a convincing mosaic of discrimination around that tile, she must present evidence that reasonably suggests that Ms. Scott's racism colored the other pieces of the picture, since Plaintiff admitted at her deposition that she believes that Ms. Scott— and only Ms. Scott—discriminated against her on the basis of her race. (Pl. Dep. at 135.) Plaintiff cannot make such a showing.

Citing *Sparks v. Pilot Freight Carriers, Inc.*, 850 F.2d 1554 (11th Cir. 1987), Plaintiff contends that the mere fact that Ms. Scott was involved in the decisionmaking process forecloses summary judgment in this case. [Doc. 44 at 11.] In that case, the plaintiff alleged that her supervisor, Long, influenced his

supervisor, Connell, to fire the plaintiff in retaliation for her rebuffing his (Long's) sexual advances.  830 F.2d at 1564.  In discovery, Connell testified that he made the decision to fire the plaintiff independently and without consulting Long, and the district court, finding that the Connell's testimony was unrefuted, granted summary judgment in favor of the defendant.  *Id.* at 1565.  The Eleventh Circuit reversed, finding that there was evidence that Long influenced Connell to fire plaintiff in retaliation for rebuffing his advances, including that Connell and Long were friends; Connell had spoken about the plaintiff before she was fired; the defendant's proffered reason for terminating plaintiff and not a similarly-situated male employee was arguably implausible; and, significantly, "Long's purported attempts to use his relationship with Connell to retaliate against other female employees."  *Id.*  From this evidence, the court found, a reasonable jury could conclude that the plaintiff's reaction to Long's advances influenced the decision to terminate her employment.

Here, by contrast, although a jury could find that Ms. Scott was involved in and influenced the decision to reprimand and fire Plaintiff, Plaintiff has not come forward with evidence that Ms. Scott's purported racial bias actually infected the employment decisions in this case.  She offers no evidence of suspicious timing,

no ambiguous statements concerning the basis of her discharge, and no comparatively or systemically worse treatment of African-American employees. So even crediting Ms. Smith's and Plaintiff's testimony that Ms. Scott repeatedly made offensive statements that she hated African-Americans and used the n-word, Plaintiff has not presented sufficient evidence that shows her alleged general bias against African-Americans influenced the decision to terminate Plaintiff's employment. *See Awaad v. Largo Med. Ctr., Inc.*, 564 F. App'x 541, 544 (11th Cir. 2014) (when primary evidence was a comment during criticism of Palestinian plaintiff that he was practicing medicine the "Palestinian way," but which was not directly linked to the adverse action of revoking the plaintiff's medical privileges, case did not fall into convincing mosaic framework); *see also Maddox v. Grimmer Realty*, No. 1:09-CV-02212-JHE, 2015 WL 6951918, at *20 (N.D. Ala. Nov. 10, 2015) (rejecting plaintiff's arguments that a convincing mosaic existed based upon "various racial comments and slurs, which c[ould] be construed as evidence of a discriminatory animus," because "there [w]as no evidence linking this general bias to [Plaintiff]'s termination").

Plaintiff's other evidence does not further her efforts to piece together a convincing mosaic. As for Plaintiff's performance issues, her assertion that she

34

was, in fact, performing well is belied by the undisputed evidence that the occupancy rate and AR figures for the Deer Creek and Clayton Village properties did not meet Defendant's requirements and that Plaintiff failed to open the Deer Creek pools on time, despite multiple warnings that she do so.  Plaintiff argues that the occupancy numbers at Deer Creek at the time that she was terminated were better than at the time she won the property manager of the year award.  [Doc. 44 at 8.]  But Defendant has presented unrebutted evidence that when Plaintiff won the award for 2013, it was for goals set for that year.  (Riutta Dep. at 29.)  Plaintiff was terminated for failing to meet goals in 2015, a year and a half later.  With regard to the Deer Creek pools, Plaintiff argues that in 2013, she opened one pool at Deer Creek in mid-June (after Memorial Day), and that in 2015, she opened both pools before she was terminated.  [Doc. 44 at 8.]  Once again, regardless of the expectations in 2013, it is clear that in 2015 Plaintiff had been asked to open both pools before Memorial Day, that she understood that the pools needed to be opened by then, that she understood the residents of Deer Creek expected the pools to be open by Memorial Day, and that neither pool was open by Memorial Day.  (*See* Pl. Dep. at 82; DSMF ¶ 32; R-DSMF ¶ 32.)  Nor is the fact that Defendant ultimately sold the Deer Creek and Clayton Village properties in 2017 because they were not

profitable probative of racial animus.  And, for the reasons discussed above, the fact that Defendant did not fire Ms. Smith, Ms. Loeffelbein, Ms. Claudio, or Ms. Scott due to the poor performance of the Georgia properties is not probative of discriminatory intent.

As for the timing of Plaintiff's write-ups and termination, Plaintiff's assertion that her performance woes started when Ms. Scott became her supervisor is not accurate.  Even before Ms. Scott became her supervisor, Plaintiff was demoted to Property Manager because she did not meet the performance expectations as an Area Manager, a fact she does not dispute.  Further, during the first half of 2015, Plaintiff's management of the Deer Creek and Clayton Village properties was below expectations and was not showing sufficient improvement. Although Plaintiff points to evidence indicating Ms. Loeffelbein's performance reviews for Plaintiff declined between July 1 to December 31, 2014 period and the January 1 to June 30, 2015 periods, after Ms. Scott became her supervisor [*see* Doc. 44 at 8-9; *see also* Pl. Dep. Exs. 7, 16], Plaintiff has not put forward evidence connecting the change in Ms. Loeffelbein's assessments to Ms. Scott or challenging the basis of for the negative review.  Indeed, the undisputed evidence shows that Ms. Loeffelbein completed the negative mid-year evaluation in 2015, and that

36

Plaintiff did not generally disagree with the review.  (Loeffelbein Dep. at 53-54; Pl. Dep. at 155.)   Plaintiff also presents no evidence that Ms. Scott had any involvement in its preparation.  Thus, the change in Ms. Loeffelbein's performance evaluations is not probative of discriminatory animus.

With regard to Plaintiff's assertion that Defendant allowed her to issue a reprimand to an African-American employee but not a Caucasian one, Plaintiff offers no more than her own speculation that race played any part.  (Pl. Dep. at 252-53.)  The record shows that on July 6, 2015, Plaintiff sent a draft of the written reprimand for employee Robert Schaffer, a Caucasian man, to Ms. Scott for approval.  (Scott Dep. at 143, Ex. 26.)  Ms. Scott found the draft to be "very confusing" and sent it back to Plaintiff for revisions.  (*Id.*)  After revising it, Plaintiff sent it back to Ms. Scott, who forwarded it to Ms. Loeffelbein for review. (*Id.*)  Ms. Loeffelbein then sent the draft back with additional comments of her own, which Ms. Scott forwarded to Plaintiff for revision.  (*Id.*)  Plaintiff testified that she revised the draft to address Ms. Loeffelbein's concerns and sent the draft to Ms. Scott and Ms. Loeffelbein.  (Pl. Dep. at 257.)  Plaintiff did not hear anything further about the draft, so she called Ms. Loeffelbein, who told Plaintiff that she and Ms. Scott had spoken, and that they would not approve the write-up because

Mr. Schaffer was "a good guy."[17]  (*Id.* at 252-53.)  Plaintiff simply assumed that because "he's a good guy" meant "because he's white," based upon her knowledge—at some point—of Ms. Scott's attitude towards African Americans. (*Id.* at 253-54.)  Without more, this evidence does not reasonably suggest that racial animus played any role in the decision not to reprimand Mr. Schaffer.  Indeed, Plaintiff testified that she has no reason to believe that Ms. Loeffelbein is racist, (*see* Pl. Dep. at 110), and she presents no evidence as to what Ms. Scott may have said to Ms. Loeffelbein to influence the decision not to reprimand Mr. Schaffer. Thus, even assuming that Ms. Scott bore racist feelings toward African-Americans, Plaintiff presents no evidence to suggest racial animus had any effect on the decision not to reprimand Mr. Schaffer.[18]

---

[17] Ms. Scott testified that she could not recall any other communications with about the issue after sending Ms. Loeffelbein's comments to Plaintiff.  (Scott Dep. at 150.)  For purposes of summary judgment, the Court credits Plaintiff's testimony that she spoke to Ms. Scott and Ms. Loeffelbein about the reprimand after she received Ms. Loeffelbein's comments.

[18] As for the African-American employee, Ahmad Breckins, it was Plaintiff who wrote him up; and she has not offered any evidence that race played a role in his discipline.  (Pl. Dep. at 252).  Further, although Plaintiff states in her brief that the two were to be written up "for the same situation," implying that they were similarly situated, she indicates that the Mr. Breckins had only been with Defendant "for a short period of time," and was written up for pool-related issues, whereas Mr. Schaffer was to be written up for issues related to Clayton Village.  (*Id.* at 251-52.)

Finally, Plaintiff's argument that Defendant had no choice but to hire an African-American to replace her does not show discriminatory animus. Even assuming that every candidate in the applicant pool for Plaintiff's position was African-American, the fact that Defendant hired an African-American does not suggest Defendant acted with racial animus with respect to Plaintiff. To be sure, a plaintiff might be able to rely on the lack of non-African-American applicants to rebut an employer's affirmative attempt to use its hiring of an African-American as evidence the decisionmaker was not motivated by racial animus. But by the same measure, it does not tend to show that the decisionmaker acted out of discriminatory intent. In terms of piecing together a mosaic, this piece of evidence is simply neutral.

### 3.    Summary

For all the reasons discussed above, Plaintiff has failed to present evidence from which a factfinder could reasonably find that Plaintiff was reprimanded or terminated because of her race. Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment should be **GRANTED** as to Plaintiff's Title VII and Section 1981 disparate treatment claims.

### B.     Hostile Work Environment Claims

"A hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (internal quotes omitted).  Hostile work environment claims under Title VII and Section 1981 use the same analytical framework.  *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010); *Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002).  To establish that she was subjected to a racially hostile work environment, then, a plaintiff must demonstrate that:  (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon a protected characteristic (such as race); (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment; and (5) there is a basis for holding the employer liable for the conduct of the harassers.   *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en banc).   In deciding whether a hostile environment existed, a court must review all of the circumstances, focusing on four factors: the frequency of the allegedly discriminatory conduct; the severity of the conduct; whether the conduct was

40

threatening or humiliating, and whether it unreasonably interfered with the plaintiff's performance at work. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999). As to each, the plaintiff "must present concrete evidence in the form of specific facts, not just conclusory allegations and assertions." *Godoy v. Habersham Cty.*, 211 F. App'x 850, 854 (11th Cir. 2006) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)).

Defendant argues that Plaintiff's hostile work environment claim fails because any alleged harassment was not based on race, the alleged harassment was not severe or pervasive, and there is no basis to hold Defendant liable for the alleged harassment as she did not report it. [Doc. 42-8 at 4-10.] Plaintiff counters that "[i]n addition to the comments cited on page above,[19] [Plaintiff] offered evidence as to Ms. Scott's treatment of her treated her [sic], of writeups that began immediately following Ms. Scott becoming her supervisor, and of the fact that she

---

[19] It is unclear what comments Plaintiff is specifically referring to, as there are no "comments cited" on the immediately preceding page of Plaintiff's response brief. [*See* Doc. 44 at 13.] The Court presumes that Plaintiff means to refer to Ms. Scott's derogatory comments concerning African-Americans and repeated use of the n-word in the presence of Ms. Smith (but outside of Plaintiff's presence), as well as Ms. Scott's statement to Plaintiff at the awards ceremony in January 2014 that Plaintiff received the property manager of the year award because she is African-American.

was terminated within weeks of Ms. Scott becoming her supervisor." [Doc. 44 at 13.] Plaintiff goes on to argue that "[t]his is not a case based upon discriminatory remarks (other than one) being made directly to [Plaintiff]. This is a case based on a hostile environment being created by the various means set forth above.[20]" [*Id.* at 14.] The gist of Plaintiff's hostile work environment theory, therefore, is that "she was being treated poorly and negatively reviewed because of her race which led her to significant health problems requiring her to take leave from work." [*Id.* at 15.]

Plaintiff also argues that Defendant may not avail itself of a *Faragher/Ellerth* defense because the defense is not available when the hostile work environment results in an adverse employment action. [Doc. 44 at 16.] Here, Plaintiff maintains, Ms. Scott was Plaintiff's supervisor from May 2015 through the date of Plaintiff's termination on July 30, 2015, and Ms. Scott participated in the decision to terminate Plaintiff's employment. [*Id.* at 17.] In the alternative, Plaintiff argues that even if the defense were available to Defendant, it would fail because Plaintiff reported

---

[20] Plaintiff's reference to the "various means set forth above" is imprecise. Presumably, Plaintiff refers to the comments that Ms. Scott made to Ms. Smith and Plaintiff, Ms. Scott's interactions with Plaintiff during the period that she supervised Plaintiff, Plaintiff's two write-ups in May and June 2015, and the termination of her employment in July 2015.

Ms. Scott's statement that Plaintiff won the property manager of the year award because of her race to Ms. Smith, who was then her supervisor.  [*Id.*]  Plaintiff finally argues that she did not act unreasonably in not reporting the comment and Ms. Scott's treatment to Ms. Riutta or human resources based of her understanding that Ms. Riutta and Ms. Scott had a "close friendship, if not a sexual relationship." [*Id.*]

Although Plaintiff has presented evidence that Ms. Scott repeatedly used the n-word and made comments expressing general hatred of African-Americans, none of those statements was made in Plaintiff's presence, much less directed at Plaintiff. The only comment that Ms. Scott made to Plaintiff about her race was in January 2014, when Ms. Scott stated that Plaintiff won the property manager of the year award just because she was African-American.   Though Plaintiff found that comment offensive and rude, there is no evidence that it interfered with her job performance.  As the Supreme Court has explained, the "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation omitted; alteration supplied); *see also Mendoza*, 195 F.3d at 1246 (to qualify as severe or pervasive, harassment must

43

"alter the terms or conditions of []employment").[21]   All of the racially troubling statements that Ms. Scott purportedly made occurred well more than a year before any of the employment decisions at issue in this case, and outside of Plaintiff's presence.   In the absence of any evidence Ms. Scott's statements interfered with Plaintiff's job performance, those statements cannot form the basis of a hostile work environment claims.

All that is left to support the hostile work environment claim is Plaintiff's two write-ups, her termination, and Plaintiff's vague complaints about Ms. Scott's behavior toward her during the final three months of her employment.   As explained in the preceding section, Plaintiff has not demonstrated that any of those

---

[21] Indeed, the Eleventh Circuit has regularly affirmed the grant of summary judgment in favor of employers in case in which the plaintiff experienced substantially worse treatment.   *See Error! Main Document Only.McCann v. Tillman*, 526 F.3d 1370, 1378-79 (11th Cir. 2008) (affirming summary judgment on hostile work environment claim where African American employee alleged that supervisor referred to her as "girl" and black male employees as "boys," and Sheriff referred to a former black employee as a "n***** b****" and declared that "he had never received the 'n***** vote' and that he didn't want it" because comments were sporadic and isolated and stretched out over a two year period); *Alexander v. Opelika City Sch.*, 352 F. App'x 390, 392-93 (11th Cir. 2009) (summary judgment granted against African American employee who claimed that he was called boy eight times during a two-year period and whose supervisor made comment about how to tie a noose around a person's neck because he did not demonstrate existence of severe or pervasive harassment).

incidents were racially motivated, and, therefore, she cannot rely on them to support her hostile work environment claim.  As discussed, Plaintiff has failed to present evidence sufficient to show that Defendant was motivated by racial animus when she was written up and discharged.  Likewise, Plaintiff's vague assertion that Ms. Scott treated her poorly is insufficient here, as it is not at all clear precisely what conduct Plaintiff complains about.  The Court will not dig through the record in an attempt to develop Plaintiff's argument for her.  *See Chavez v. Secretary, Fla. Dept. of Corrs.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[J]udges are not like pigs, hunting for truffles," and, thus, the Court is "not required to ferret out delectable facts buried in a massive record.").  As such, her naked assertion that she was treated poorly, without pointing to specific instances of alleged hostile treatment, is insufficient to support her claim.  To the extent that Plaintiff contends that Ms. Scott was rude or impolite, to Plaintiff, she has failed to present evidence that being "treated poorly" had anything to do with her race.

For these reasons, therefore, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** as to Plaintiff's Title VII and section 1981 hostile work environment claims.[22]

### C.     Plaintiff's FMLA Interference and Retaliation Claims Fail Because She Was Not An "Eligible Employee" Under the Act.

Under the FMLA, an "eligible employee" is entitled to 12 workweeks of leave during any 12-month period because of a serious health condition that makes the employee unable to perform the functions of her position, among other reasons. 29 U.S.C. § 2612(a)(1). "To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims:  interference claims, in which an employee asserts that [her] employer denied or otherwise interfered with [her] substantive rights under the Act, and retaliation claims, in which an employee asserts that [her] employer discriminated against [her] because [she] engaged in activity protected by the Act. *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (citations omitted).  To prevail on a claim of FMLA interference, an employee must show that she was denied a benefit to which she was entitled under the FMLA.  *Martin v. Brevard Cty. Pub.*

_____

[22] In light of this conclusion, the Court need not—and does not—address Defendant's alternative argument under *Faragher/Ellerth*.

46

*Schs.*, 543 F.3d 1261, 1266-67 (11th Cir. 2008). It is essential, therefore, that the employee show that she was "eligible employee" under the FMLA. To make such a showing, she must show that she "has worked for a covered employer for at least twelve months, has worked at least 1,250 hours during the previous twelve months, and has been employed at a worksite where there are least fifty or more employees within a seventy-five mile radius [of her worksite]." *Rich v. Delta Air Lines, Inc.*, 921 F. Supp. 767, 772 (N.D. Ga. 1996) (citing 29 U.S.C. § 2611(2)(A); 29 U.S.C. § 2611(2)(B)(ii)). "An employee must satisfy each of these criteria independently to be eligible for FMLA leave." *Id.* The FMLA also prohibits an employer from retaliating against its employee for engaging in activities protected under the FMLA. In evaluating an FMLA retaliation claim, in the absence of direct evidence of discrimination, courts use the *McDonnell Douglas* burden-shifting framework. *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017). A prima facie case of retaliation requires a showing that the employee engaged in statutorily protected conduct, the employee suffered an adverse employment action, and there is a causal connection between the two. *Id.*

Defendant argues that Plaintiff's FMLA interference and retaliation claims fail as a matter of law because she was not an "eligible employee," and, therefore,

47

was not entitled to any benefits under the FMLA or protected by its provisions. [Doc. 42-8 at 15-17.]  In support, Defendant points to the uncontroverted deposition testimony of Ms. Snyder that Defendant does not have at least fifty employees within a 75-mile radius of the properties where Plaintiff worked.  (*See* Snyder Dep. at 106-07.)

In response, Plaintiff contends that she has established she was an eligible employee because Defendant admitted in its answer Plaintiff's allegation that "At all times relevant to this action, Plaintiff was an 'eligible employee' under the FMLA." (*See* Am. Compl. ¶ 31.)  She further argues that she would be prejudiced if Defendant were to retreat from that admission now, as she did not conduct discovery into the issue of whether Defendant was an eligible employee, or, more specifically, the location and number of Defendant's employees.  [Doc. 44 at 17-20.]

Defendant replies that its admission was a mistake and that there is no evidence suggesting that Defendant employed at least fifty employees within a seventy-five mile of Plaintiff's worksite.  [Doc. 51 at 12-13.]  Defendant maintains that "[i]gnoring Ms. Snyder's deposition testimony in favor of a mistaken

admission in [Defendant's] Answer would not serve justice or fairness."  [*Id.* at 12.]

Putting aside for a moment Defendant's admission in its answer, Ms. Snyder's testimony that Defendant did not employ fifty or more employees in a seventy-five mile radius of any of Plaintiff's worksites in Georgia stands unrebutted.[23]  Thus, but for Defendant's admission, there is no dispute of fact concerning this issue.  The issue, therefore, is whether Defendant is nevertheless bound by its admission that Plaintiff was an "eligible employee under the FMLA."

"Normally, factual assertions in pleadings . . . are considered to be judicial admissions conclusively binding on the party who made them."  *Palm Beach Int'l, Inc. v. Salkin*, No. 10-60995-CIV, 2010 WL 5418995, at *6 (S.D. Fla. Dec. 23, 2010) (quoting *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983)); *see also Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983) ("[T]he general rule [is] that a party is bound by the admissions in [its] pleadings.")).  But the Court "unquestionably, has the right to

---

[23] Plaintiff points to evidence that Defendant "routinely has between 175 and 200 employees."  (PSAF ¶ 107.)  The total number of employees is not determinative, however; thus, it is not reasonable to infer that Defendant had at least fifty employees within a seventy-five-mile radius of Plaintiff's worksites.

relieve a party of his judicial admission if it appears that the admitted fact is clearly untrue and the party was laboring under a mistake when he made the admission." *Id.* (quoting *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963)); *see also McGee v. O & M Boat Co.*, 412 F.2d 75, 76 (5th Cir. 1969) (stating that a district court "may, in a proper exercise of discretion, relieve a party of the adverse consequences of a judicial admission.").

Here, the Court concludes that exceptional circumstances exist to relieve Defendant from its admission that Plaintiff was an eligible employee under FMLA. The evidence is clear and undisputed that Defendant's admission was mistaken, and there is nothing to suggest that Defendant made the admission in order to gain some tactical advantage in this case. Quite to the contrary, such an admission can only inure to Plaintiff's benefit, as it goes to one of the essential elements she must prove to establish liability under the FMLA. What's more, the allegation at issue here is a legal conclusion. In the context of analyzing a complaint on a motion to dismiss, Courts repeatedly hold that simply alleging that the plaintiff is an "eligible employee" under FMLA is a legal conclusion. *See, e.g., Armstrong v. Doherty Fla. N. Port, LLC*, No. 8:14-CV-1270-T-33, 2014 WL 3585713, at *3 (M.D. Fla. July 21, 2014) (holding that allegations that plaintiff was "an employee within the

meaning of the FMLA" and "eligible for FMLA leave" are legal conclusions); *see also Shanks v. Potter,* No. CV 110-045, 2010 WL 8347107, at *6 (S.D. Ga. Dec. 28, 2010) (collecting cases recognizing that naked assertion that a plaintiff is an eligible employee is a legal conclusion), *aff'd*, 451 F. App'x 815 (11th Cir. 2011); *accord Marcum v. Smithfield Farmland Corp.*, No. CV 6:16-180-DCR, 2016 WL 6780311, at *2 (E.D. Ky. Nov. 15, 2016) ("Whether a worker is an "eligible employee" under the FMLA is a legal conclusion . . . and must be supported by sufficient factual matter to support the allegation.").   Moreover, apart from the conclusory allegation that Plaintiff was an eligible employee under the FMLA, the amended complaint does not allege any ***facts*** that a plaintiff must establish to show that she is an eligible employee, including the number of employees who worked within seventy-five miles of Plaintiff's worksite.   Had Plaintiff alleged—and Defendant admitted—that Defendant had fifty or more employees within a seventy-five-mile radius of Plaintiff's worksite, then perhaps a better case could be made that Defendant should be bound by such an admission.  *Cf. EEOC v. Pines of Clarkston,* No. 13-CV-14076, 2015 WL 1951945, at *3 (E.D. Mich. Apr. 29, 2015) (holding that employer was bound by its admission in answer that it employed at least fifteen people, the employee threshold for coverage under the Americans with

Disabilities Act, and that it was a covered employer under the Act).  But here, Plaintiff merely alleged the conclusion without the underlying facts.

The Court is also not persuaded by Plaintiff's argument that she will be unfairly prejudiced because she did not conduct discovery as to the number of employees within seventy-five miles of Plaintiff's worksite.  [Doc. 44 at 19-20.] To start, Plaintiff did conduct discovery about the issue.  When Ms. Snyder testified at her deposition that Plaintiff was not an eligible employee because Defendant did not satisfy the numerosity requirement of the act, counsel for Plaintiff questioned Ms. Snyder about the issue.[24]  (*See* Snyder Dep. at 104-11.)  Nor does Plaintiff proffer what additional evidence she would have sought to obtain though discovery.

In sum, under the extraordinary circumstances here, allowing Plaintiff to reap to benefit of Defendant's mistaken admission would frustrate and run counter to the overarching principle that the Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the

---

[24] Indeed, when Defendant realized its mistake, several weeks before discovery ended, it sought leave to amend the complaint.  [*See* Doc. 35.]  Plaintiff therefore cannot argue that she was unaware of the significance of Ms. Snyder's testimony.

just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1; *see also* Fed. R. Civ. P. 8(e) (stating that pleadings should be construed "so as to do justice"). For these reasons, therefore, the Court finds that Plaintiff has failed to show a triable issue of fact as to whether she was an eligible employee under the FMLA.

Because there is no dispute that Plaintiff was not an eligible employee under the FMLA, her interference and retaliation claims fail as a matter of law. She cannot prevail on an FMLA interference claim because, as an ineligible employee, she cannot claim that she was denied benefits under the FMLA. Nor can she claim that she was retaliated in violation of the FMLA because "the statute does not protect an attempt to exercise a right that is not provided by the FMLA." *Walker v. Elmore County Bd. of Educ.*, 379 F.3d 1249, 1253 (11th Cir. 2004). As noted above, to state a prima facie claim for FMLA retaliation, the employee must establish that she engaged in protected activity, "which means that the leave she has taken must be leave that she is eligible for and is entitled to take under the Act." *Rodas v. Assurance Quality Grp., Inc.*, No. 3:13-CV-077-TCB-RGV, 2014 WL 12479989, at *12 (N.D. Ga. Nov. 7, 2014), *report and recommendation adopted*, 2015 WL 11511578 (N.D. Ga. Jan. 30, 2015) (alterations omitted). Thus, when an

employee takes leave for which she is not eligible to take under the FMLA, she "cannot be deemed to have engaged in protected activity and, therefore, termination by the employer in such a circumstance cannot be grounds to support a retaliation claim under the FMLA." *Id.* (quotation omitted). Accordingly, "irrespective of her characterization of her claims as alleging 'interference' or 'retaliation,'" Plaintiff's FMLA claims fail as a matter of law because she was not eligible for or entitled to take FMLA leave. *Hegre v. Alberto-Culver USA*, Inc., 485 F. Supp. 2d 1367, 1376 (S.D. Ga. 2007) (holding that plaintiff's FMLA retaliation claim failed as she was not an eligible employee because employer did not employ at least fifty employees within seventy-five miles of plaintiff's worksite), *aff'd*, 275 F. App'x 872 (11th Cir. 2008).

For these reasons, therefore, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** as to Plaintiff's FMLA interference and retaliation claims.

## IV.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED**.

IT IS SO RECOMMENDED this 28th day of May, 2019.

_____

JOHN K. LARKINS III
United States Magistrate Judge